William WEINBERGER, et al., Plaintiffs, Appellants,

v.

GREAT NORTHERN NEKOOSA CORP., et al., Defendants, Appellees.

No. 90–1822.

United States Court of Appeals, First Circuit.

Heard Dec. 6, 1990.

Decided Feb. 11, 1991.

Stephen D. Oestreich (argued), with whom Laurence D. Paskowitz, Wolf Popper Ross Wolf & Jones, Peter L. Murray, Thomas C. Newman, and Murray, Plumb & Murray were on brief for plaintiffs, appellants.

Stuart J. Baskin (argued), with whom Alan S. Goudiss, Shearman & Sterling, Robert H. Stier, Jr., David A. Soley, and Bernstein, Shur, Sawyer & Nelson were on brief for defendants, appellees.

Peter J. Brann, Asst. Atty. Gen. (argued), State of Me., with whom James E. Tierney, Atty. Gen. and Thomas D. Warren, Deputy Atty. Gen., were on brief for State of Maine, amicus curiae.

Before SELYA and CYR, Circuit Judges, and BOWNES, Senior Circuit Judge.

SELYA, Circuit Judge.

This appeal requires that we consider, for the first time, how a district court should respond to an application for attorneys' fees made in conjunction with the voluntary discontinuance of a class action suit under circumstances where there is no common fund and the fees are to be paid pursuant to a "clear sailing" agreement.[1] We hold that in such a situation the district court should ordinarily exercise its equity jurisdiction and entertain the application. We hold further that, rather than merely rubber-stamping the request, the court should scrutinize it to ensure that the fees awarded are fair and reasonable. And because these holdings are not completely dispositive of the matters in controversy, we remand for additional proceedings.

## I. BACKGROUND

On October 31, 1989, Georgia–Pacific Corporation (G–P) announced an unsolicited tender offer for all the outstanding com-

---

1. In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling.

mon stock of appellee Great Northern Nekoosa, Inc. (GNN) at a cash price of $58 per share. On the same day, G–P filed two lawsuits in Maine's federal district court seeking to dismantle GNN's takeover defenses. In part, G–P challenged the constitutionality of Maine's anti-takeover law, Me.Rev.Stat.Ann. tit. 13–A, § 611 (1988).

On November 12, GNN formally rejected the tender offer, asserting that G–P's bid was inadequate in price, unlawful, and not in the best interests of GNN's shareholders. The directors simultaneously mobilized an arsenal of defenses. By then, the present appellants, GNN shareholders, had begun to initiate class actions against GNN and its directors. One such action was filed on November 3; a second on November 4; and the third on December 6. Each shareholder suit echoed G–P's claims (1) that the directors, by animating GNN's takeover defenses, had breached their fiduciary duty, and (2) that Maine's anti-takeover statute was unconstitutional.[2] In due course, the State of Maine intervened in those actions which questioned the constitutionality of the Maine statute.

Intent on capturing its prey, G–P increased its offer to $63 per share on November 19. GNN rejected the higher offer but, as required by its bylaws, scheduled a special shareholders' meeting and referendum. G–P's attempt to accelerate the meeting was rebuffed by the federal court. *See Georgia–Pacific Corp. v. Great Northern Nekoosa Corp.*, 727 F.Supp. 31 (D.Me. 1989). An avalanche of intense activity, in and out of court, descended during the next few months. Truncating the tale, it suffices to say that matters did not go well for GNN's directors and their shark repellents. *See, e.g., Georgia–Pacific Corp. v. Great Northern Nekoosa Corp.*, 731 F.Supp. 38 (D.Me.1990) (invalidating certain anti-takeover provisions contained in GNN's by-

laws). By early 1990, more than 75% of the outstanding shares had been tendered to G–P.

On February 13, 1990, GNN announced that it was for sale to the highest bidder. No white knights appearing, negotiations took place between G–P and GNN. On February 20, the hostile takeover came to a friendly conclusion when G–P agreed to pay a sweetened price of $65.75 per share. As the hostilities wound down, GNN and G–P dismissed all pending litigation inter sese. Similarly, the class action plaintiffs agreed to dismiss their suits as moot, contingent upon payment of attorneys' fees and expenses. To forestall the possibility that fee litigation might further delay consummation of the tender offer, a pact emerged wherein the class action plaintiffs agreed to "take no steps to attach any part of the funds to be paid to the [GNN] shareholders pursuant to the upcoming tender offer." In return, G–P "agreed to pay the plaintiffs' attorneys' fees and expenses as shall be awarded by the United States District Court for the District of Maine." If the parties were "unable to reach agreement on the appropriate amount of ... fees and expenses," the class action plaintiffs would be free to petition the court to set the amount.[3] The tender offer, involving an aggregate payment of some $3,740,000,-000, was consummated on March 6, 1990, 97.3% of the shares having been tendered. The remaining stock was subsequently acquired in a short-form merger. Although no definitive accord was reached on fees, G–P did enter into a clear sailing agreement with the appellants, stipulating that it would not oppose a court-approved award of $2,000,000 or less.[4]

On June 21, the class action plaintiffs moved to dismiss their actions as moot and applied for $2,000,000 in fees. In support

---

**2.** For our purposes, the multiplicity of class actions makes no difference. Hence, we shall treat the situation as if the three suits comprised but one.

**3.** Although the parties' arrangement specifically included expenses as well as counsel fees, we will sometimes use the word "fees" as a shorthand reference to the combination.

**4.** Of course, GNN was the takeover target and the defendant in the shareholder suits. But consummation of the tender offer erases any distinction between GNN and G–P in that regard, GNN having been merged into G–P and the bargain having been struck with class counsel after the tender offer's success was assured.

of their motion and application, they submitted only a short memorandum chronicling the course of the litigation. They did not provide the district court with contemporaneous time records, affidavits, or other supporting documentation. Faithful to the clear sailing agreement, G–P did not object. On June 28, the district court, under the aegis of Fed.R.Civ.P. 23(e), dismissed the actions as moot. At the same time, the court denied the unopposed application for fees, writing:

> [C]ounsel have failed to set forth any factual predicate of evidentiary quality by which the Court could properly make an award of reasonable attorneys' fees and expenses in any amount in this matter.... [I]f the parties have agreed to payment of a specific fee, there would appear to be no occasion for this Court to pass upon the reasonableness of the agreement of the parties in that respect.

Plaintiffs immediately asked the court to reconsider, filing a cornucopia of supporting documents. The court refused, citing plaintiffs' "failure to timely produce a record ... of the fee issues at the time of entry of [the June 28] order...."

On appeal, appellants claim that the district judge erred both in spurning their unopposed fee application and in refusing to consider, and then to grant, their augmented fee application.

**5.** Both sides have briefed the question anent the district court's use of equity powers as a matter of federal common law, notwithstanding that the original causes of action limned in the class complaints were state-law claims premised on diversity jurisdiction. The proposition seems supportable. *See, e.g., Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 646 F.2d 800, 806 (2d Cir. 1981) ("State law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision."), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *cf. Mathewson Corp. v. Allied Marine Indus., Inc.,* 827 F.2d 850, 853 n. 3 (1st Cir.1987) ("Settlement of a case already in progress in the federal courts implicates matters of considerable federal concern, entirely apart from the substantive merits. In such situations, the federal interest is sufficiently great that the proper rule of decision may well be a uniquely federal one."). In any event, we are free to accept the parties' implied concession that federal law governs. *See Mathewson,* 827 F.2d at

## II. JUDICIAL ATTENTION TO FEE APPLICATIONS

Inasmuch as the court below questioned whether there was any "occasion ... to pass upon" the fee request, we are called upon to examine the nature and extent of a district court's jurisdiction over a fee application submitted in conjunction with the prearranged dismissal of a class action. We then assess whether such jurisdiction should have been exercised more expansively in the instant case.[5]

### A. *The District Court's Jurisdiction.*

■ The court below intimated that if the parties had independently agreed to a fee not chargeable to the class membership or payable from a common fund, the court need not intervene. We start our analysis, therefore, with the threshold question of whether a district court should be required to pass on the reasonableness of a fee application in a class action case where the fees will neither be paid from, nor directly diminish, the common fund.[6] We believe that when a fee application is submitted ancillary to, or as part of, the termination of a class action, the district court should ordinarily determine the reasonableness of the fees, notwithstanding that the source of payment does not directly impair the class recovery.

853 n. 3, *quoting Oman Int'l Fin. Ltd. v. Hoiyong Gems Corp.,* 616 F.Supp. 351, 358 n. 5 (D.R.I. 1985).

**6.** We use the term "common fund" somewhat loosely throughout this opinion, referring not only to the classic case where a recovery is effected on behalf of the class and thereafter distributed among the members, *see, e.g., Skelton v. General Motors Corp.,* 860 F.2d 250 (7th Cir.1988); *Kargman v. Sullivan,* 589 F.2d 63 (1st Cir.1978), but also to the case where the class action produces not a common fund but a common benefit, say, in a tender offer, an increased price per share (which enriches the class even though the emolument is not paid into a central kitty but goes directly to the shareholders). In such "common benefit" cases, courts have held that class counsel's reasonable fees may be charged to the beneficiaries despite the absence of a common fund. *See, e.g., Reiser v. Del Monte Properties Co.,* 605 F.2d 1135 (9th Cir. 1979).

Fed.R.Civ.P. 23(e) states in its entirety: "A class action shall not be dismissed or compromised without the approval of the court." While the rule does not explicitly mention the oversight of fee applications, the approval function has routinely been extended to embrace fees, whether or not pre-negotiated, in those cases where the plaintiffs' attorneys are to be paid out of a common fund (and where, consequently, there is an inherent tension between the interests of the class and the interests of the lawyers). As Professor Moore has put it:

> Courts have used this approval authority to review fee settlements and, on occasion, to reduce negotiated fees. Such action may be necessary because the interests of the class members' attorneys may differ from the interests of the class members themselves.... [T]he court's power to approve or reject a settlement under Rule 23(e) enables the court to ensure fairness for the class members.

3B Moore's Federal Practice ¶ 23.91 at 23–533 to 23–534; *see also Piambino v. Bailey (Piambino I)*, 610 F.2d 1306, 1328 (5th Cir.) (to minimize conflict between attorney and class, district court "must address" the issue of attorneys' fees before approving class action settlement), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980). We know unimpeachably that the source of a court's authority to award attorneys' fees in such common fund cases is "the historic power of equity to permit ... a party ... recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund ... itself or directly from the other parties enjoying the benefit." *Alyeska Service Pipeline Co. v. Wilderness Soc.*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1974).

Where there is no common fund, and class action plaintiffs seek attorneys' fees directly from defendants, in addition to damages or other relief due to the class, this equitable principle does not literally apply. Indeed, absent either statutory authorization or sanctionable behavior entitling plaintiffs to recover their fees, there is no satisfactory basis on which a court can compel the shifting of lawyers' fees. *See id.* at 247, 95 S.Ct. at 1616 (absent statutory or common law exception, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser"); *Christensen v. Kiewit–Murdock Invest. Corp.*, 815 F.2d 206 (2d Cir.) (similar), *cert. denied*, 484 U.S. 908, 108 S.Ct. 250, 98 L.Ed.2d 209 (1987). It follows, then, that a court cannot be obligated to pass on the reasonableness of an attorneys' fee application in such circumstances simply because the class action plaintiffs and a complaisant defendant, having traded swords for plowshares, prefer to have a judicial imprimatur on the fee award. Whether the parties come before the court having reached agreement on the reallocation of litigation costs and seeking court approval for that agreement or, in the alternative, having failed to negotiate such an agreement and seeking to have the court resolve an internal dispute, there is no strict legal requirement that the court act on the issue.

■■ On the other hand, to say that a court has no unbending legal obligation to entertain fee applications is neither to suggest nor imply that a court cannot or should not do so. We have previously acknowledged, and today reaffirm, that jurisdiction over the main cause of action carries with it equitable jurisdiction to award attorneys' fees in appropriate circumstances. *See Angoff v. Goldfine*, 270 F.2d 185, 186 (1st Cir.1959). Thus, even where no fee-shifting statute or common law exception thrives, a court can, under the authority of its historic equitable powers, exercise its discretion to entertain fee applications and, at least where no objection is interposed, award attorneys' fees. We rule, therefore, that the court below had equitable jurisdiction to review and pass upon the reasonableness of a fee application submitted for judicial approval as part of a class action settlement.

### B. Should Jurisdiction Have Been Exercised Here?

■ It is within this framework that we examine the idiosyncrasies of the case at

bar. Here, plaintiffs' counsel abjured a claim for fees under the common benefit doctrine, instead negotiating the arrangement which we have described. There was no actual agreement as to the specific amount G–P would pay, only a clear sailing agreement: G–P would not contest the petition and would pay any sum up to $2,000,000 awarded by the district court.[7] Appellants then asked the court, in conjunction with its required consideration of their motion for leave to discontinue the class action, Fed.R.Civ.P. 23(e), to decide the matter of fees. Such an undertaking was certainly within the court's equitable jurisdiction even in the absence of a common fund, see supra Part II(A); and there are compelling reasons why courts should ordinarily review all fee agreements negotiated ancillary to class action settlements. The district court should have done so in this instance.

Over a decade ago, we first spoke about the important nexus between judicial scrutiny and the avoidance of excessive or undeserved fee awards in the class action environment. Furtado v. Bishop, 635 F.2d 915, 919 (1st Cir.1980). Since then, the fear that class actions will prove less beneficial to class members than to their attorneys has been often voiced by concerned courts, e.g., Piambino v. Bailey (Piambino II), 757 F.2d 1112, 1143–44 (11th Cir.1985), cert. denied, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986), and periodically bolstered by empirical studies, e.g., Alexander, Do the Merits Matter? A Study of Settlements in Securities Class Actions, 43 Stan.L.Rev. 497 (1991); Rosenberg & Shavell, A Model in Which Suits are Brought for Their Nuisance Value, 5 Int'l Rev.L. & Econ. 3 (1985). The problem has two aspects: extortion (that is, the prosecution of strike suits) and collusion (that is, the tension which necessarily arises between class members and class counsel when settlements and attorneys' fees are negotiated simultaneously). While the conflict between a class and its attorneys may be most stark where a common fund is created and the fee award comes out of, and thus directly reduces, the class recovery, there is also a conflict inherent in cases like this one, where fees are paid by a quondam adversary from its own funds—the danger being that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees. See Saylor v. Lindsley, 456 F.2d 896, 900–01 (2d Cir.1972); see also Coffee, The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation, 48 Law & Contemp.Probs. 5, 26–33 (1985). It is because of the potential risk that plaintiffs' attorneys and defendants will team up to further parochial interests at the expense of the class that the Rule 23(e) protocol employed by several circuits explicitly includes scrutinizing settlements for indicia of collusion, see, e.g., Plummer v. Chemical Bank, 668 F.2d 654, 658 (2d Cir.1982); Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1169, 1215–16 (5th Cir.), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1978), including collusive fee settlements. E.g., Ficalora v. Lockheed California Co., 751 F.2d 995, 997 (9th Cir.1985). We approve the protocol and believe it can logically be extended to the situation at hand.

Here, as in any similar case, G–P's agreement not to contest fees up to a stated maximum exacerbated the potential conflict of interest between the plaintiff class and class counsel. See Malchman v. Davis, 761 F.2d 893, 906–08 (2d Cir.1985) (Newman, J., concurring), cert. denied, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); In re WICAT Secur. Litigation, 671 F.Supp. 726, 729 n. 1 (D.Utah 1987). Moreover, timing is crucial to a tender offer and any delay can be fatal. See Hyde Park Partners, L.P. v. Connolly, 839 F.2d 837, 853 (1st Cir.1988); San Francisco Real Estate Investors v. Real Estate In-

---

7. Thus, to the extent that the district court interpreted the application as asking it simply to rubber-stamp the "agreed ... payment of a specific [$2,000,000] fee," the court misunderstood the gist of the arrangement. Such an error seems to have been deliberately invited by the plaintiffs, who in their June 21 filing neglected to submit a copy of the clear sailing agreement, instead stating in a cover letter to the court that "[G–P] has agreed to pay the $2,000,000 counsel fee which will serve as compensation to and reimbursement of expenses to [the lawyers]."

*vest. Trust,* 701 F.2d 1000, 1002–03 (1st Cir.1983). We think the district court was constrained to recognize as a practical matter that the lawyers were in a position to coerce a fee agreement from G–P regardless of whether there was any merit to their claim against the increased price of the shares. Payment of a fee—even a fee reaching $2,000,000—would be a relative pittance to G–P when contrasted with the ominous prospect of a multi-billion-dollar tender offer faltering on the very brink of success. While we do not in any way imply that either collusion or extortion took place here, the scenario was such as to suggest, strongly, that the fee request be placed under the microscope of judicial scrutiny.

This course was particularly indicated because of the presence of the clear sailing agreement. Such a clause by its nature deprives the court of the advantages of the adversary process. The source of the proposed payment renders it improbable that class members will come forward to challenge the reasonableness of the requested fee. Meanwhile, the payor is bound by contract not to contest the application. The absence of adversariness makes heightened judicial oversight of this type of agreement highly desirable. Furthermore, the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class. *See Malchman,* 761 F.2d at 908 (Newman, J., concurring) ("It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without obtaining something in return. That something will normally be at the expense of the plaintiff class."). We believe it to be self-evident that the inclusion of a clear sailing clause in a fee application should put a court on its guard, not lull it into aloofness.[8] *Cf.* Note, *Abuse in Plaintiff Class Action Settlements: The Need for a Guardian During Pretrial Settlement Negotiations,* 84 Mich.L.Rev. 308, 322

(1985). To the extent that the court below felt that the parties' accord relieved it of any obligation to scrutinize the fee arrangement, it was wrong.

## III. THE FEE APPLICATION

Having determined that the district judge should have exercised equitable jurisdiction over the matter of fees, we turn now to the sufficiency of appellants' application.

### A. *The Lodestar.*

■ In addition to questioning whether the fee application should be entertained at all, the judge also found the application wanting because it lacked the "factual predicate of evidentiary quality" needed to determine the fees. Appellants argue that this was pettifoggery and that the court, despite the application's sparseness, should reflexively have approved it. They contend, in effect, that judicial acquiescence in the requested $2,000,000 stipend should have followed *ex proprio vigore* from the fact that the clear sailing agreement was negotiated at arms' length between sophisticated parties. We do not agree. The court's role as the guarantor of fairness obligates it not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services. Rather, the court should scrutinize fee applications carefully. Such perscrutation is particularly necessary where a clear sailing agreement strips away any true market-based check upon the scope and cost of counsel's efforts. After all:

The fee charged a client by its attorneys is a private matter in which the court, barring unusual circumstances, will not get involved. When, however, a court is compelled by the nature of the case or statutory mandate to award attorney fees to a party, the determination of such award is not only a matter of public record, it becomes part of the great body of our law. A court would be

---

**8.** Although the lack of adversariness may equally place an appellate tribunal on its mettle, it has been a lesser factor here. The State of Maine moved for leave to appear as an amicus before us out of a generalized concern "that negotiated attorneys' fees in plaintiffs' class actions can be a potential source of abuse." Amicus Brief at 15. We granted the motion and permitted the State to file a brief and participate in oral argument.

shirking its responsibility to render a principled decision were it to accept without scrutiny and close examination the fees agreed upon by client and counsel. *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622, 632 (1st Cir.1983), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984).

■ To be sure, *Milgo* was a patent case, where the issue was the amount of attorneys' fees to be awarded to the prevailing plaintiff pursuant to statute. Yet, any distinction cuts in favor of a more vigorous exercise of the principle in class actions. For the reasons we have already mentioned, a fee accord in a class action should be subject to the closest and most systematic scrutiny before gaining judicial approval. *Cf., e.g., Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884 (2d Cir.1983) ("The presence of an arms' length negotiated agreement among the parties weighs strongly in favor of approval, but such an agreement is not binding on the court."), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984); *Piambino I*, 610 F.2d at 1328 (similar). Moreover, *Milgo*'s reasoning is fully applicable since an award approved by the court and paid by G–P to plaintiffs' attorneys would be a matter of public record and would have precedential value in the context of class action settlements in contested tender offer cases.[9]

■ Although judicial oversight of fee applications in the Rule 23(e) environment is desirable, the permissible approaches to determining reasonable fees in cases of this stripe may vary. Judge Coffin's words, albeit written in the context of the Fees Act, 42 U.S.C. § 1988, are closely in point: "The difficulty for both fee-setting

and fee-reviewing courts, in a field so susceptible to arbitrariness, is the achievement of decision-making that is fair to the parties and understandable to the community at large yet not unnecessarily burdensome to the courts themselves." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984); *see also United States v. Metropolitan Dist. Comm'n*, 847 F.2d 12, 15–16 (1st Cir.1988). If an alternative method is not expressly dictated by applicable law, we have customarily found it best to calculate fees by means of the time-and-rate method known as the lodestar. *See, e.g., Metropolitan Dist. Comm'n*, 847 F.2d at 15; *Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 85–86 (1st Cir.1984); *Milgo*, 717 F.2d at 632; *Furtado*, 635 F.2d at 919–20. In this instance, the district court indicated its clear preference for this approach. Given the lodestar method's proven usefulness as an understandable and manageable way of determining reasonable attorneys' fees in statutory cases, we find no reason why district courts should be divested of authority to employ it in analyzing fee applications submitted for approval in connection with class action settlements under Rule 23(e). Indeed, considering the dangers we have discussed, use of the lodestar may well add measurably to the likelihood of fairness where fees are sought pursuant to a clear sailing agreement.[10]

### B. *The Proffer.*

■ Once we have determined that the court was entitled to use the lodestar approach, the propriety of its next step becomes clear. Although the method provides a "flexible paradigm" not meant to bind the nisi prius court to any single way of calculating the number of hours reason-

**9.** Indeed, the appellants have attempted to justify the reasonableness of their requested fees in part by listing for us a series of fees awarded or approved in other tender offer cases. *See* Appellants' Brief at 43–44.

**10.** We are aware of the tendency exhibited by some courts, particularly in common fund cases, to jettison the lodestar in favor of a "reasonable percent of the fund" approach. *See, e.g., In re Activision Secur. Litigation*, 723 F.Supp. 1373, 1378 (N.D.Cal.1989); *see also Court Awarded Attorney Fees*, Report of the

Third Circuit Task Force, 108 F.R.D. 237 (1985); Newberg, *Attorney Fee Awards* § 2.07 at 8–9 (1990 Cum.Supp.); Coffee, *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L.Rev. 669, 691 (1986). Because the absence of any true common fund renders the percentage approach inapposite here, we cannot fault the district court's implied premise that the lodestar is the soundest available alternative.

ably expended, *Metropolitan Dist. Comm'n,* 847 F.2d at 15–16, the court must make concrete findings and explain its reasoning. *See id.* at 16; *Jacobs v. Mancuso,* 825 F.2d 559, 560 (1st Cir.1987); *Grendel's Den,* 749 F.2d at 950. To enable this to be accomplished, the fee-seeker must usually provide a particularized account of his claim. *See Grendel's Den,* 749 F.2d at 952 (warning that "the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance"). We have painstakingly delineated the specific documentary preconditions to fee awards, requiring litigants to submit a "full and specific accounting" of the tasks performed, the dates of performance, and the number of hours spent on each task. *See Calhoun v. American Cleveland Corp.,* 801 F.2d 558, 560 (1st Cir.1986); *Milgo,* 717 F.2d at 632; *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *see also Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

■■■■ Although we are mindful of the Court's concern that "[a] request for attorney's fees should not result in a second major litigation," *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941, we remain convinced that independent inquiry by the trial judge is a vital component of the fee-setting process. *See Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983). In constructing the lodestar, private fee agreements cannot substitute for the conscientious application of the court's informed judgment to the lawyers' detailed billing records. *See Segal,* 746 F.2d at 86; *Furtado,* 635 F.2d at 920; *Sargeant v. Sharp,* 579 F.2d 645, 648 (1st Cir.1978).

In light of these guidelines, it is readily evident that appellants' fee application was,

as the district court thought, woefully deficient. The application was bereft of contemporaneous time records or any other suitable documentation. By making such a barebones proffer, appellants deprived the court of the wherewithal it needed to make an intelligent lodestar calculation.[11] To have granted a sizeable fee in such straitened circumstances would have been tantamount to "shirking [the court's] responsibility to render a principled decision." *Milgo,* 717 F.2d at 632. The district court did not err in denying the initial fee application.

### C. *Lack of a Hearing.*

■■■■ Appellants claim that, despite the obvious shortcomings in their application, the judge had an obligation, in lieu of rejecting the proffer, to afford them an evidentiary hearing. Normally, we review the decision not to convene an evidentiary hearing only for abuse of discretion. *See United States v. Cannons Engineering Corp.,* 899 F.2d 79, 93–94 (1st Cir.1990). We deem that to be the proper standard of review in a fee-award case. We are unable, twice over, to discern any abuse here.

■■■■ 1. *Failure to Lay a Foundation.* In the first place, motions "do not usually culminate in evidentiary hearings." *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1120 (1st Cir.1989). By the same token, Rule 23(e) does not require that an evidentiary hearing be held before the court approves or rejects a proposed class action settlement. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 79 (2d Cir.1982) (no hearing required unless there are "cogent factual objections to the settlement"), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *see also* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1797 at 354–55 (1986). In brief, "hearings cannot be convened at the whim of a suitor, made available like popsicles in

---

**11.** We are completely unmoved by appellants' reliance on the offer made in their June 21 transmittal letter, and repeated in a footnote to the short memorandum that accompanied the application, to supplement the record "should the court require any further information." In applying for judicial approval of a fee award, it is the plaintiffs' burden to furnish the evidence required, not the court's burden to seek it out. In our view, the court acted fully within the scope of its discretion in proceeding on the basis of the evidentiary record actually submitted to it.

July, just because a passerby would like to have one." *United States v. DeCologero,* 821 F.2d 39, 44 (1st Cir.1987).

These precepts have pertinence in the context of fee awards. While the procedure for calculating the lodestar contemplates that an evidentiary hearing may be desirable, such a hearing is not always obligatory. *See Calhoun,* 801 F.2d at 561. In any event, it is the applicant's duty to lay a sufficient foundation for a hearing. The court's responsibility to convene a hearing, if one were needed, arises only "after receiving documentation." *Furtado,* 635 F.2d at 920. When, as here, the fee-seeker fails to submit the rudimentary information essential to a calculation of the lodestar, the district court is under no obligation to conduct a hearing before denying the fee application. *See generally* D.Me. Loc.R. 32 (requiring fee applications to be filed and served "together with supporting ... affidavits"); D.Me.Loc.R. 19(a) (requiring movant to file, with any motion, "[a]ffidavits and other documents setting forth or evidencing facts on which the motion is based").[12]

 2. Failure Seasonably to Request a Hearing. Conclusively dispositive of the issue is the fact that the plaintiffs never properly requested a hearing. "[W]e regularly turn a deaf ear to protests that an evidentiary hearing should have been convened, but was not, where ... the protestor did not seasonably request such a hearing in the lower court." *Aoude,* 892 F.2d at 1120. This rule applies full bore in the case before us. To be sure, appellants claim their statement that "we would be happy to review any of the matters set forth in these papers at a conference with the Court," contained in the transmittal letter which accompanied their fee application, constituted a request for a hearing. It did not. Requests for hearing must be explicit and should be embodied in the pleadings, not in correspondence which may never reach either the docket or the judge's attention. *See, e.g., Hebert v.*

*Wicklund,* 744 F.2d 218, 221–22 & n. 3 (1st Cir.1984) (refusing to treat an undocketed letter from counsel as the functional equivalent of a Rule 56(f) filing); *Cochran v. Celotex Corp.,* 125 F.R.D. 472 (C.D.Ill.1989) (appropriate method of communicating with court is by means of motion, not by means of correspondence); *see also* D.Me. Loc.R. 19(f) (all motions will be decided without a hearing "unless otherwise ordered by the Court on its own motion or, in its discretion, upon request of counsel").

## IV. THE MOTION FOR RECONSIDERATION

 The district court's rejection of plaintiffs' motion for reconsideration is considerably more problematic. That motion was forthcoming within a few days after denial of the fee application. Although a second attempt, it was docketed well within the temporal window framed by Local Rule 32 (requiring fee applications to be filed within 45 days of the entry of the final judgment). It fully remedied the defects in the initial application, proffering to the court exactly what should have been proffered originally: detailed, contemporaneous time records and serial affidavits.

 We acknowledge that appellate review of the denial of reconsideration "extends only to the appropriateness of that denial—not to the fundamental correctness of the underlying judgment." *Appeal of Sun Pipe Line Co.,* 831 F.2d 22, 24–25 (1st Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). We acknowledge, too, the necessity of ceding district courts "substantial discretion in deciding whether to strike up the band again in order to allow the losing party to argue new material." *Id.* at 25. Nevertheless, substantial discretion is not unbridled discretion. As in other areas where the abuse-of-discretion standard holds sway, we will overturn a trial court's refusal to reconsider a matter if, upon review of the record as a whole, we are left with "a

---

12. Appellants rely on *Sargeant v. Sharp,* 579 F.2d 645, in support of their claim that a hearing was obligatory. Their reliance is mislaid. Although we did hold that a hearing was required in *Sharp,* we also declined to "decide whether a formal evidentiary hearing is required in every instance where an award of attorney's fees is contested." *Id.* at 647.

definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Aggarwal v. Ponce School of Medicine*, 745 F.2d 723, 727 (1st Cir.1984), *quoting In re Josephson*, 218 F.2d 174, 182 (1st Cir.1954). We think that this is such a case. There was insufficient reason to deny reconsideration merely because the movants had erred the first time around. *Compare, e.g., De Jesus v. Banco Popular de Puerto Rico*, 918 F.2d 232 (1st Cir.1990) (reversing denial of motion for reconsideration on attorneys' fees and remanding for fee computation in a case where plaintiff originally sought fees on one ground but, after fees were denied, promptly sought reconsideration on a more compelling ground). The lower court's denial of the motion to reconsider must be set aside.

Having gone this far, we need go no further. We reject out of hand appellants' Pollyannaish contention that we, on the basis of the present record, should proceed to award class counsel fees totalling $2,000,000. Such a contention assumes, first, that the proffered records must be accepted at face value. That is rarely the case. The district court will have to undertake an independent review of the time records to determine "the reasonableness of the hours spent and the hourly rate sought." *In re Spillane*, 884 F.2d 642, 647 (1st Cir.1989). Moreover, the lodestar calculation, when obtained, will be subject to possible enhancement or diminution by the court if it determines that a multiplier or divider should be applied.[13] If this tamisage results in a reasonable fee different in amount from the requested fee, it is the court's amount which must be awarded, up to the negotiated cap, any other agreement between the parties notwithstanding. We see no anomaly in binding the appellants by the court's findings on the fair value of legal services rendered. That, indeed, is the readily foreseeable price of the very

approval which class counsel sought. In this respect, lawyers are like other litigants; they cannot have their cake and eat it too.

*The dismissal of the class actions is affirmed. The denial of the initial fee application is likewise affirmed. The denial of the motion to reconsider is reversed and the cause remanded for a hearing to set the amount of class counsels' fees and expenses. We believe that, given his extensive knowledge of the litigation, the case should continue to be handled by the district judge thus far presiding. We specifically direct that no fees or expenses be awarded for work in connection with this appeal, all parties to bear their own costs relative thereto.*

*So ordered.*

---

**13.** The documentation attached to appellants' motion for reconsideration reveals that they are seeking a lodestar (number of hours worked multiplied by claimed hourly rates) of $649,-194.50, expenses of $40,332.75, and a multiplier

of 3.02, bringing their fee request to a total of roughly $2,000,000. We take no view on whether this, or any other, multiplier may be appropriate in the circumstances of this case.