CLAY, Circuit Judge,
dissenting.
Contrary to the focus of the majority opinion, this is not primarily a case about the theoretical policy considerations that should be taken into account in order to determine or apportion the economic or societal benefits of this form of consumer class action litigation. What the majority misses in its survey of the case law and academic literature is that the court below abused its discretion in approving a class action settlement which fails to adequately *295 protect the interests of class members and unduly enriches class counsel at the expense of their own clients.
Rule 28 imposes obligations on class representatives, class counsel, and the district court to protect the interests of absent class members: class representatives may be appointed only if they will “fairly and adequately protect the interests of the class”; class counsel has the “duty” to do the same; and a court may approve a settlement “only after a hearing and on finding that it is fair, reasonable, and adequate.” Fed.R.Civ.P. 23(a)(4), (g)(4), (e)(2). We have previously described class counsel’s duty as “fiduciaries]” of the class, whose performance as such “courts must carefully scrutinize.” In re Dry Max Pampers Litig., 724 F.3d 713, 718 (6th Cir.2013); see also Rawlings v. Prudential-Bache Properties, Inc., 9 F.3d 513, 516 (6th Cir.1993). Because class counsel fell short of their obligations both under Rule 23 and as fiduciaries, and the district court failed to exercise the necessary careful scrutiny to determine that the settlement was fair, reasonable and adequate, I respectfully dissent.
When deciding whether to approve a class action settlement, courts look to several factors:
(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.
Int’l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp., 497 F.3d 615, 631 (6th Cir.2007). The circumstances of this settlement, including its disproportionate fee award, strongly suggest an abuse of discretion by the district court in approving the settlement, including the fee award.
The Ninth Circuit warned that courts “must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.” In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 947 (9th Cir.2011). Bluetooth gave three examples of such signs: (1) “when counsel receive a disproportionate distribution of the settlement”; (2) “when the parties negotiate a ‘clear sailing’ arrangement[1] providing for the payment of attorneys’ fees separate and apart from class funds, which carries ‘the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class’ ”; and (3) “when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.” Id. (internal citations omitted). All three warning signs are present in this case.
Class counsel, who were also class counsel in the court below, argue that we must consider the compensation to the class and the award of attorney’s fees separately. They obtained what they consider significant relief for the -class — which, in congratulating themselves, they label “exceptional” at least five times in their brief — and therefore believe that they have rightly earned a hefty fee award. Objector Joshua Blackman, however, urges us to view the settlement and the fee award as insep *296 arable. Because the class recovery was dwarfed by the fee award class counsel ultimately received — a fee award negotiated behind closed doors — -the settlement and fee award represent an unconscionable elevation of the interests of class counsel over those of the class that should be rejected under Dry Max Pampers. See 724 F.3d at 717 (rejecting $2.73 million attorney fee award where the class itself received no cash whatsoever). To evaluate these arguments, both separately and together, it is necessary to retrace the relief, the settlement, the fee award, and the role of the district court.
At the time of the fairness hearing in this case, the deadline to file claims had passed, and although some of the payments were still being finalized, the claims administer, Jeffrey Dahl, had filed a declaration, docketed in the record, that identified 49,810 “Allowed Claimants”[2] out of a total gym membership of 605,735. (R. 136-1. Dahl Deck of Feb. 11, 2014 at Page ID 2659.) Thus, when the fairness hearing took place, the district court was on notice that only some 8.2% of class members had obtained monetary relief. Dahl testified at the fairness hearing that the median response rate in a study of consumer class actions was 5-8%. (R. 139, Fairness Hr’g Tr. at Page ID 2722.) These figures are consistent with the recent observation of the Third Circuit that “consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns.” Sullivan v. DB Investments, Inc., 667 F.3d 273, 329 n. 60 (3d Cir.2011) (en banc) (quoting finding of special master). Dahl’s testimony, and Plaintiffs’ argument, might be recharacterized to ask whether the district court, aware of the low customary response rate in consumer class actions, should have approved a settlement in which 91.8% of the class— whose interests class counsel were under a fiduciary obligation zealously to represent — is left with absolutely nothing.
The majority opinion’s argument regarding the propriety of the district court’s approval of the settlement is predicated entirely on acceptance of the status quo. Focusing on the average payment amount to a claimant — and not the average payout spread across all class members — the magistrate judge described the recovery, which by that point had been fixed at $1,593,240, as “substantial.”[3] (R. 141, Report and Recommendation at Page ID 2844.) And perhaps this case may exceed the average claim rate of consumer class actions. However, there is another interpretation of class counsel’s performance in this scenario: class counsel spent years litigating this case and, as a result of the claims process in whose design they participated, their clients were left with little to show for their counsel’s efforts. From this perspective, class counsel did poorly in absolute terms.
In the district court’s view, this purportedly substantial recovery and the protracted proceedings — which had already dragged on for nearly three years by the time of the report and recommendation— were enough to justify class counsel’s requested $2,390,000 fee award. (Id. at *297 Page ID 2831-32, 2835-36, 2841.) The district court first justified its findings under the lodestar approach, a method of compensating counsel based on hours of work at the applicable rates (and sometimes a multiplier), and then performed a so-called “percentage of the fund crosscheck” whereby it calculated the percent-, age of the fee award as a proportion of its valuation of an $8.5 million constructive common fund.[4] See Rawlings, 9 F.3d at 516-17 (approving both lodestar and percentage-of-the-fund methods in this Circuit). Such cross-checks against the other method are not uncommon. See Van Horn v. Nationwide Prop. & Cas. Ins. Co., 436 Fed.Appx. 496, 500 (6th Cir.2011); Bowling v. Pfizer, Inc., 102 F.3d 777, 780 (6th Cir.1996). Even if Blackman had not raised issues about the alloeational fairness of this fee relative to the class payout, the fee award could not be sustained under either of these methodologies.
Although “the lodestar method has been criticized for being too time-consuming of scarce judicial resources,” the “listing of hours spent and rates charged provides greater accountability.” Rawlings, 9 F.3d at 516. Class counsel failed to submit the voluminous records contemplated by Rawl-ings and instead submitted perfunctory, impenetrable bullet-point lists in two affidavits in which they simply asserted that they had kept contemporaneous records. (R. 114-1, McCormick Decl. at Page ID 1865-80; R. 114-2, Troutman Decl. at Page ID 1881-1903.) To these bullet lists were appended the lengthy curriculum vitae of class counsel. (Id.) With no such contemporaneous records actually submitted by class counsel, the message to the district court was obvious: we are experienced litigators; just trust us that we did this work. The district court took class counsel at their word, although it chided counsel that “the best practice may have been to submit more detailed records of the costs and time expended in the litigation.” (R. 141, Report and Recommendation at Page ID 2870.)
Confronted with counsel’s uncorroborated sworn statements, the district court should not have been so trusting. This Circuit places the “burden of providing for the court’s perusal a particularized billing record” on the party seeking fees. Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 553 (6th Cir.2008) (quoting Perotti v. Seiter, 935 F.2d 761, 764 (6th Cir. 1991)) (upholding fee award where counsel “submitted 52 pages of detailed, itemized billing records that specify, for each entry, the date that the time was billed, the individual who billed the time, the fractional hours billed (in tenths of an hour), and the specific task completed”). Reviewing case law, Imwalle held that “[although counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified.” 515 F.3d at 553 (citations omitted). District courts, Imwalle noted, have reduced fee awards “where billing records ‘lumped’ together time entries under one total so that it was ‘impossible to determine the amount of time spent on each task.’ ” Id. (quoting Cleveland Area Bd. of Realtors v. City of Euclid, 965 F.Supp. *298 1017, 1021 (N.D.Ohio 1997)). In the bullet points at issue here, there was no description of the specific task or of the subject matter — apart, of course, from what counsel simply termed the “Litigation.” For example:
• I[, Thomas McCormick, class counsel,] have 11 years of experience in handling complex litigation and billed at my standard hourly rates of $260 per hour in 2011, $350 in 2012; and $375 in 2013. My time constitutes over 52% of the time billed by Vorys in the Litigation.
(R. 114-1, McCormick Decl. at Page ID 1868.) Such “documentation” is completely inadequate and should not have been accepted, especially coming from attorneys who touted their experience in the succeeding pages. Cf. McCombs v. Meijer, Inc., 395 F.3d 346, 360 (6th Cir.2005) (affirming fee award where the district court found that “entries made by [the plaintiffs] counsel were sufficient even if the description for each entry was not explicitly detailed”) (emphases added). In approving the $2.39 million fee award, the magistrate judge relied on this deficient recitation and the oral representation of class counsel that the lodestar by the time of the fairness hearing was “just shy of $2.8 million.” (R. 141, Report and Recommendation at Page ID 2871.) That the fee ultimately awarded was below its orally asserted lodestar should not, alone, save it. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433-37, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (allowing district court to reduce lodestar amount for inadequate documentation and limited success).
In performing its percentage-of-the-fund cross-check, the district court also committed legal error because it miscalculated the value of the fund. Following the approach of Lonardo v. Travelers Indem. Co., 706 F.Supp.2d 766 (N.D.Ohio 2010), it chose as its valuation the midpoint of the $1,593,240 actual payout to class members and the “Available Benefit” of $15,500,430, the maximum payout if all class members were to file claims, for a final valuation of $8,546,835. (R. 141, Report and Recommendation at Page ID 2875.)' It then added administration costs ($496,259) and the attorney’s fee itself for a “Total Class Benefit” of $11,433,094, of which the requested fee award was 20.9% — an acceptable percentage, in its view. (Id.)
Not only has no Circuit in the country approved of such a methodology, it is premised on the faulty and fictional premise that counsel should be given credit for compensation that the class did not receive — in other words, for millions of dollars that would never leave Defendant’s coffers. We have long held that “[w]hen awarding attorney’s fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.” Rawlings, 9 F.3d at 516 (emphasis added). Rawlings further stated that “the percentage of the fund method more accurately reflects the results achieved.” Id. With the claims deadline months past, the district court knew that neither the $15.5 million “Available Benefit” nor the $8.5 million midpoint figure could ever materialize. Yet the district court could have predicted this beforehand simply because it was presiding over a claims-made consumer class action, which would have an extremely low response rate, as courts have begun to recognize. See Sullivan, 667 F.3d at 329 n. 60.
This is the predictable “economic reality” of claims-made class actions, and one that we must acknowledge. Dry Max Pampers, 724 F.3d at 717 (quoting Strong v. BellSouth Telecomms., Inc., 137 F.3d 844, 849 (5th Cir.1998)). The defense bar, at least, recognizes this; among defense *299 counsel, low participation rates under claims-made class action settlements are both common knowledge and a selling point: class members recover — and a defendant pays — much less when class members opt in than when a defendant disburses funds directly to class members.[5] The problem is not, as the majority seems to think, with settlement procedures that are intended to discourage claims. Even without overt efforts on the part of defense counsel to thwart claims, opt-in claims procedures naturally depress response rates to single-digit percentages for the very predictable reason that class members simply are not sufficiently incentivized to bother to opt in.
The Seventh Circuit rightly rejected a hypothetical total maximum payout of $14.2 million in a consumer class action in which $1 million was paid out as “fiction,” holding that the district court should have computed the percentage of the fund by calculating the “ ‘ratio of (1) the fee to (2) the fee plus what the class members received.’ ” Pearson v. NBTY, Inc., 772 F.3d 778, 781 (7th Cir.2014) (quoting Redman v. RadioShack Corp., 768 F.3d 622, 630 (7th Cir.2014)).[6] See also Strong, 137 F.3d 844. This is a simple, common-sense rule: in assessing the fairness of the division of the payout between class counsel and the class, courts should look to the amounts actually pocketed by both parties. Thus, the district court should have used the $1,593,240 actually paid as the benefit to the class for the calculation of its fee.
Yet if valuations based on counterfactual maximum payouts are fiction, they are the sort of fiction in which courts, including the Supreme Court some decades ago, have indulged. In Boeing Co. v. Van Gemert, 444 U.S. 472, 480, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), the Supreme Court held that the “right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel.” Accord Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 437 (2d Cir. 2007). Although Boeing has never been directly overruled, it has hardly been met with universal acclaim. In a statement respecting the denial of a petition for cer-tiorari in Int’l Precious Metals Corp. v. Waters, 530 U.S. 1223, 120 S.Ct. 2237, 147 L.Ed.2d 265 (2000), Justice O’Connor expressed serious misgivings about a fee award of $13,333,333 based on a reversion-ary fund of $40 million, the unclaimed portion of which (all but the $6,485,362.15 actually paid out to the class) would revert to the defendant:
We had no occasion in Boeing, however, to address whether there must at least be some rational connection between the fee award and the amount of the actual distribution to the class. The approval of attorney’s fees absent any such inquiry could have several troubling consequences. Arrangements such as that at issue here decouple class counsel’s financial incentives from those of the class, increasing the risk that the actual distribution will be misalloeated between attorney’s fees and the plaintiffs’ recovery. *300 They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing [sic] class counsel to settle lawsuits in a manner detrimental to the class.
120 .S.Ct. at 2237-38. The Advisory Committee notes to the 2003 amendments to Rule 23 that “[o]ne fundamental focus” of a district, court’s analysis “is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members.... For a percentage approach to fee measurement, results achieved is the basic starting point.” Fed.R.Civ.P. 23, 2003 Amend., Note to Subdivision 23(h). The Advisory Committee had no power to abrogate Boeing, but it nonetheless distinguished benefits from actual results.[7]
In Pearson, the Seventh Circuit also found Boeing distinguishable from constructive common fund cases because Boeing was actually litigated to a judgment of $3,289,359 plus interest, and “[n]othing in the court’s order made Boeing’s liability for this amount contingent upon the presentation of individual claims.” 772 F.3d at 782 (quoting Boeing, 444 U.S. at 479 n. 5, 100 S.Ct. 745). In a case involving an actual, quantifiable common fund with a cy pres beneficiary, we valued “settlement proceeds,” which, by virtue of the cy pres beneficiary, the defendant had to pay out, as the amount received by both the class members and the cy pres beneficiary for calculation of attorney’s fees. Moulton v. U.S. Steel Corp., 581 F.3d 344, 352 (6th Cir.2009). Such valuations are intuitive when courts are forced to calculate liabilities or a defendant actually agrees to pay out a certain sum. In so-called “constructive common fund” cases where the vast majority of class members do not claim their awards, but in which unclaimed money remains with the defendant, district courts should not be allowed to engage in unreasonable, counterfactual valuations of the fund — even supposed compromise measures, as the district court did here.
The correct valuation of the benefit of the class at $1.59 million leads naturally to Blackman’s preferred approach of treating the $1.59 million class payout in the context of the $2.39 million attorney fee award. In a case involving a “clear sailing” agreement not to contest fees before the court, the Eighth Circuit described settlement terms and a negotiated fee amount as a “package deal.” Johnston v. Comerica Mortgage Corp., 83 F.3d 241, 246 (8th Cir.1996). By Johnston’s sound logic, the fee award and the settlement must be considered together because the fee amount was, for all intents and purposes, negotiated between the parties and memorialized in the settlement agreement, as the other settlement terms were. Courts have frequently expressed “the fear that class actions will prove less beneficial to class members than to their attorneys,” as here. Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991). Courts’ concerns are twofold — not only might class counsel benefit more than the class, but they might also benefit at the expense of the class. A defendant, concerned only with its total payout, has little incentive to be concerned with “the allocation between the class payment and *301 the attorneys’ fees.” In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products. Liab. Litig., 55 F.3d 768, 820 (3d Cir.1995). See also Dry Max Pampers, 724 F.3d at 717; Strong, 137 F.3d at 849-50. Wein-berger recognized that class counsel could, in essence, sell out its client: “the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.” 925 F.2d at 524.
To decide whether that was the case here, it is worth doing a little arithmetic. The amount that the attorneys received exceeded the amount the class received by just over 50%; put differently, calculating the “relevant” ratio that Pearson and Red-man proposed — which compares the amounts received by class counsel and the class as a percentage of the defendant’s total payout, exclusive of administration costs — reveals that the attorney’s fees represent 60% of Defendant’s payout. • See Redman, 768 F.3d at 630 (rejecting fee award where 55% of the defendant’s payout went to attorney’s fees). Even though the $1.59 million paid to the class was a more substantial result than the “perfunctory,” non-cash relief at issue in Dry Max Pampers, which Blackman concedes, that case compels us to consider the allocation of relief between class counsel and the class. 724 F.3d at 718. Because of its concerns about the misallocation of relief between class counsel and the class, Dry Max Pampers rejected a settlement that “g[ave] preferential- treatment to class counsel” as demonstrating “disregard” of their “fiduciary responsibilities.” Id. A fee award that exceeds the recovery of the class by 50%, as the $2.39 million attorney fee award granted by the district court in this case did, seemingly constituted a windfall to the attorneys that the district court should not have allowed in the proper exercise of its discretion.
Two particular clauses in the settlement relating to the fee award are of additional concern: the “clear sailing” clause, whereby Defendant agreed not to contest any attorney’s fee request up to $2,390,000, and the “kicker” clause, which stipulated that if the district court were to award less than. $2,390,000 in attorney’s fees, the unpaid balance would revert to Defendant. (See R. 97-1, Settlement, at Page ID 1499-1500.) Blackman sees both these clauses as evidence of yet further “self-dealing” on the part of class counsel at the expense of the class. (Blackman Br. at 17.) The clear sailing clause required Defendant to file a notice with the district court at least 21 days before the fairness hearing stating that it did not oppose the requested fee amount up to the $2,390,000 cap. The kicker clause, in seemingly uncontroversial legalese, stipulated that whatever payment the district court approved “shall constitute full satisfaction of Defendant’s obligations” to pay the attorney’s fee. (R. 97-1, Settlement, at Page ID 1499.) A clause two paragraphs prior, stating that “such payments shall have no effect on ... the Class Payment” precluded any potential pro rata distribution of unpaid attorney’s fees — and sent such unpaid fees right back to Defendant. (Id.)
Plaintiffs defend the use of the clear sailing clause, and argue that we have upheld clear sailing agreements in the past, as in Gooch v. Life Inv’rs Ins. Co. of Am., 672 F.3d 402 (6th Cir.2012), which held that “not every ‘clear sailing’ provision demonstrates collusion.” Id. at 426 (affirming use of clear sailing provision “where the ‘clear sailing’ provision caps attorney compensation at approximately 2.3% of the total expected value of the settlement to the class members”). However, as Weinberger acknowledged,' clear sailing agreements necessarily suggest conflict between the class and its counsel, for “the very existence of a clear sailing *302 provision increases the likelihood that class counsel will have bargained away something of value to the class.” 925 F.2d at 525 (citing Malchman v. Davis, 761 F.2d 893, 908 (2d Cir.1985) (Newman, J., concurring), abrogated on other grounds by Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).
Plaintiffs also accuse Blackman of predicating his argument “on the erroneous factual assumption that negotiations concerning attorneys’ fees affected the relief available to the class,” and point to the district court’s finding that class'counsel negotiated the fee award only after agreeing to the other settlement terms. (Pis. Br. at 47.) In support of their fee request, class counsel from the two lead firms submitted affidavits to the district court in which they averred the following:
The parties did not begin negotiations on attorneys’ fees and costs until after the substantive relief was agreed upon between Plaintiffs and Urban Active. Thus, it is clear that the Settlement resulted from arms’-length negotiation and fair dealing with the named Plaintiffs and classes’ [sic] best interests in mind.
(R. 97-10, Decís, of Thomas McCormick and Mark Troutman at Page ID 1605, 1610). While the blatantly self-serving and conclusory language of the second sentence might have raised serious red flags, the ■ district court held that the risk of collusion was “lessened” because of the order of negotiations. (R. 141, Report and Recommendation at Page ID 2850.) In General Motors, the Third Circuit declined to “place such dispositive weight on the parties’ self-serving remarks” about counsel’s assurances about the order in which the settlement and fees had been negotiated. 55 F.3d at 804.
General Motors also expressed skepticism about this nearly simultaneous form of negotiation, with no intervening court involvement. Id. (citing Court Awarded Attorney’s Fees, Report of the Third Circuit Task Force, 108 F.R.D. 238 (1985)) (“even if counsel did not discuss fees until after they reached a settlement agreement, the statement would not allay our concern since the Task Force recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement”). See also Pearson, 772 F.3d at 786 (dismissing similar arguments as “not realistic”). Quoting the same Third Circuit task force report, the Ninth Circuit explained that “[e]ven if the plaintiffs attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations.” Staton v. Boeing Co., 327 F.3d 938, 964 (9th Cir.2003). Class counsel cannot be unaware that fee negotiations are nigh — that is, after all, how plaintiffs’ lawyers finance their work — and that knowledge simply might cause them to push less hard for the interests of their clients, even if they fail to realize that they are doing so.
With subconscious or even overt collusion a serious risk, the district court possesses a vital role in monitoring potential collusion. The Ninth Circuit held in Blue-tooth that “when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys’ fees and benefit to the class, being careful to avoid awarding unreasonably high fees simply because they are uncontested.” 654 F.3d at 948 (emphasis added and citations omitted). Gooch, the only Sixth Circuit case to date to have considered the validity of clear *303 sailing provisions, did not explicitly adopt the Ninth Circuit requirement of heightened scrutiny of such provisions, but Blue-tooth was correct that district courts must be especially wary when the parties agree not to contest fees in class actions. See Gooch, 672 F.3d at 426. To its credit, the district court did not simply “ignore[ ] the clear sailing fee provision,” as the court below did in Bluetooth, and instead discussed it at some length. 654 F.3d at 948. The court below nonetheless greatly underestimated how the very presence of the clear sailing provision was itself evidence of possible collusion, and thereby cast doubt on the fairness of the settlement as a whole, including the adequacy of class counsel’s representation. See Rule 23(e)(2), (g)(4).
The inclusion of the so-called “kicker clause,” which allowed unpaid attorney’s fees to revert to Defendant, only “amplifies the danger of collusion already suggested by a clear sailing provision.” Bluetooth, 654 F.3d at 949. Bluetooth recognized that these two types of suspicious clauses are intimately related: “[t]he clear sailing provision reveals the defendant’s willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees.” Id. At some point in the settlement negotiations, the parties presumably wished to resolve what would happen if the district court decided to award less than the $2.39 million cap, and agreed that, should the district court do so, any remaining funds would revert to Defendant — rather than being distributed to class members. The district court reasoned that this clause was in no way problematic and had no practical effect because class counsel were awarded the full $2.39 million in attorney’s fees. (R. 141, Report and Recommendation at Page ID 2852.) Yet as with the clear sailing clause, the district court overlooked the extent to which the inclusion of this provision in the agreement may have been the product of compromised representation by class counsel who were willing to deprive their clients of Defendant’s full set-aside for fees, so long as they themselves were paid off. The Seventh Circuit rightly held that it is impossible to discern any “justification for a kicker clause,’-’ which should be subject to a “strong presumption of [ ] invalidity.” Pearson, 772 F.3d at 787.
Consumer class actions may indeed confer societal benefits. Yet allowing such purportedly desirable litigation to remain economically viable should not guide a district court’s fairness inquiry under Rule 23. Class counsel are fiduciaries of the class, not of the public at large, and should not be able to justify a poor result for their clients because of the nobility of their mission. The majority cites some scenarios in which “significant compensation to class members is out of reach,” such as small claims and unavailable contact information for class members. Indeed, acquiescence to the dysfunctional procedures associated with the status quo of opt-in settlements fails to provide “an incentive to design the claims process in such a way as will maximize the settlement benefits actually received by the class.” Id. at 781. In fact, the desirable deterrent effect on defendants’ behavior might even be expected to increase as the payout to class members grows.
The “package deal” that this settlement, including its disproportionate fee award, offered to the class was a bad one relative to what it offered class counsel. See Johnston, 83 F.3d at 246. The disparity is so great that it calls into question whether class counsel may have violated their “fiduciary obligations” to class members. Dry Max Pampers, 724 F.3d at 718. As in Dry Max Pampers, “[t]he reality is that this settlement benefits class counsel vastly *304 more than it does the consumers who comprise the class.” Id. at 721. Accordingly, it should have flunked any fairness inquiry the district court made under Rule 23(e).

. A so-called "clear sailing” provision is an agreement on the amount of attorney’s fees whereby "the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling.” Gooch v. Life Inv’rs Ins. Co. of Am., 672 F.3d 402, 425 (6th Cir.2012).

. This was later amended to 49,808 in a later declaration from Dahl, docketed between the fairness hearing and the magistrate judge’s report and recommendation. (R. 140-1, Dahl Decl. of Mar. 21, 2014 at Page ID 2797.).

. Unclaimed funds were to be redistributed pro rata to claimants only if the total payout were less than $1.3 million, and were capped at that amount. Class counsel also did not see fit to include a cy -pres beneficiary, as there often is in cases like this; all unclaimed funds were to revert to Defendant. Compare Moulton v. U.S. Steel Corp., 581 F.3d 344, 351 (6th Cir.2009) (awarding unclaimed funds to a nearby school district).

. District courts are required to explain their reasons for "adopting a particular methodology and the factors considered in arriving at the fee.” Moulton, 581 F.3d at 352. Such explanations often discuss the following factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society’s stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.” Id.

. Wystan M. Ackerman, Class Action Settlement Structures, 63 Federation of Defense and Corporate Counsel Quarterly 35 (2012) (claiming that the "principal advantage” of opt-in, claims-made settlements from the perspective of the defense is that defendants would pay much less than if they simply mailed out checks).

. On this basis, the court also held, correctly, that' "administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class.” Id.

. The Note’s caution that "in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award,” for which it cites Blanchard v. Bergeron, 489 U.S. 87, 95, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), appears to refer .to the irrefutable fact that class counsel should have an incentive to seek and be compensated for obtaining injunctive or declaratory relief, and does not necessarily support basing a fee award on funds never actually claimed or paid out.