**In re TJX COMPANIES RETAIL SECURITY BREACH LITIGATION.**

**Civil Action No. 07–10162–WGY.**

United States District Court, D. Massachusetts.

Nov. 3, 2008.

396

Janet G. Abaray, Lopez, Hodes, Restaino, Milman & Skikos, Cincinnati, OH, William A. Baird, Launa Nicole Everman, Wayne S. Kreger, Milstein Adelman and Kreger LLP, Santa Monica, CA, John Michael Barclay, Richard P. Rouco, Whatley Drake & Kallas LLC, F. Inge Johnstone, The Lamb Firm LLC, Archie C. Lamb, Jr., Law Offices of Archie Lamb LLC, E. Kirk Wood, Birmingham, AL, Elizabeth Rosenberg, Joe R. Whatley, Jr., Whatley Drake & Kallas LLC, Danielle Disporto, Lester L. Levy, Michele F. Raphael, Wolf Popper LLP, New York, NY, Robert E. Ditzion, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Patrick J. Sheehan, Whatley Drake & Kallas LLC, Robert T. Naumes, Thornton & Naumes, LLP, Jona-

than Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, Ben Barnow, Erich Paul Schork, Barnow & Associates, P.C., Aron David Robinson, Law Office of Aron D. Robinson, Kevin Barry Rogers, Law Offices of Kevin Rogers, John R. Wylie, Futterman, Howard, Watkins, Wylie & Ashley, Chicago, IL, James R. Byrne, Michael G. Caldwell, William H. Champlin, III, William S. Fish, Jr., Tyler, Cooper & Alcorn LLP, Hartford, CT, Benjamin A. Solnit, Tyler Cooper & Alcorn, LLP, New Haven, CT, Richard Lyle Coffman, The Coffman Law, Guyte P. McCord, III, McCord, Bubsey & Ketchum, Tallahassee, FL, Michael G. Crow, Crow Law Firm, LLC, Orleans, LA, Gregory Louis Davis, Greg Davis LLC, Montgomery, AL, Michael T. Fantini, Sherrie R. Savett, Jon J. Lambiras, Berger & Montague, P.C., Philadelphia, PA, Patrick E. Geraghty, Geraghty, Dougherty & Edwards, P.A., Ft. Myers, FL, Jordan L. Lurie, Leigh A. Parker, Zev B. Zysman, Weiss & Lurie, Los Angeles, CA, Michael M. Malinowski, Michael M. Malinowski, PLC, Grand Rapids, MI, James R. Patterson, Harrison, Patterson, & O'Connor, San Diego, CA, Ralph K. Phalen, Attorney at Law, Kansas City, MO, Stephen J. Rehfuss, Rehfuss, Liguori, Law Firm, Latham, NY, Louis Cooper Rutland, Jr., Rutland Law Firm LLC, Union Springs, AL, Thomas M. Sobol, Hagens Berman Sobol Shapiro LLP, Cambridge, MA, John S. Steward, Burstein Law Firm P.C., Clayton, MO, John E. Suthers, Savannah, GA, for Plaintiffs.

Richard D. Batchelder, Jr., Brian R. Blais, Seth C. Harrington, Douglas H. Meal, Mark Szpak, Harvey J. Wolkoff, Ropes & Gray LLP, James R. Carroll, Christopher P. Connors, Nicholas I. Leitzes, Skadden, Arps, Slate, Meagher & Flom LLP, Boston, MA, Marcus R. Mumford, Darrel J. Hieber, Skadden, Arps, Slate, Meagher & Flom, Teri–Ann E. Nagata, Cary B. Lerman, Munger, Tolles & Olson, Los Angeles, CA John E. Goodman, David G. Hymer, Michael R. Pennington, Michael F. Walker, Bradley, Arant, Rose & White, LLP, North Birmingham, AL, Malcome A. Heinicke, Munger, Tolles & Olson, San Francisco, CA, James C. Huckaby, Jr., Christian & Small, LLP, John W. Scott, Scott, Dukes & Geisler, P.C., Birmingham, AL, Steven P. Mandell, Mandell Menkes & Surdyk LLC, Stephen J. Rosenfeld, Mandell Menkes, LLC, Chicago, IL, C. Bradford Marsh, Swift, Currie, McGhee & Heirs, Atlanta, GA, Margaret Diane Mathews, Akerman, Senterfitt, Tampa, FL John Michael Pickett, Young Pickett & Lee, Texarkana, TX, Harry Rosenberg, Phelps & Dunbar, LLP, New Orleans, LA Richard J.J. Scarola, Alexander Zubatov, Scarola Ellis LLP, William I. Sussman, Reboul, MacMurray, Hewitt, Maynard & Kristol New York, NY, Robert N. Webner, Vorys Sater Seymour, and Pease LLP, Columbus, OH, William Breck Weigel, Vorys, Sater, Seymour and Pease, LLP, Cincinnati, OH, Brant M. Laue, Kansas City, MO, for Defendants.

William Kenneth C. Dippel, Dippel & Davis, Dallas, TX, for Movant.

Margaret M. Pinkham, Brown Rudnick Berlack Israels LLP, Paul W. Shaw, Brown, Rudnick, Boston, MA, for Interested Parties.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

On January 17, 2007, TJX Companies, Inc. ("TJX") publicly announced that hackers had compromised its computer systems. *See* Joseph Pereira, *How Credit–Card Data Went Out Wireless Door*, WALL ST. J., May 4, 2007, at A1. In what has been characterized as the largest retail security breach in history, the intruders made off with data relating to over 45,000,-000 credit and debit cards used at TJX

stores.[1] *Id.* They also obtained personal information, such as names, addresses, and social security numbers, provided by TJX customers in order to make merchandise returns without a receipt. *See id.*

Not long after news of the breach broke, angry TJX customers arrived at the courthouse door. *See, e.g.,* Compl. [Doc. 1] (filed January 29, 2007). In this District alone, consumers filed several complaints, many of them putative class actions. The Court consolidated these cases, *see* Case Management Order [Doc. 11], and later received additional cases by order of the Judicial Panel on Multidistrict Litigation, *see In re TJX Cos. Customer Data Security Breach Litig.,* 493 F.Supp.2d 1382, 1383 (J.P.M.L.2007).

By September, 2007, TJX and counsel for the consolidated putative consumer class action reached an agreement on settlement. *See* Initial Settlement Agreement [Doc. 140]. The parties amended the settlement terms after the Court provided feedback, *see* Mem. in Supp. Prelim. App. Settlement [Doc. 293] at 3, and submitted, in December 2007, the final version of the settlement agreement (hereinafter "the Agreement") along with a motion for preliminary approval. The Court granted this motion on January 9, 2008. After reviewing objections to the Agreement and holding a fairness hearing, the Court gave final approval to the Agreement on July 15, 2008.[2]

The Court now considers class counsel's petition for attorneys' fees.

## I. THE FEE PETITION

■ Class counsel request that this Court award $6,500,000 in attorneys' fees.[3] Petition for Award of Fees and Expenses ("Petition") [Doc. 353] at 1. Because the Agreement did not create a common fund, class counsel utilized the lodestar method in order to reach their proposed fee award. Under the lodestar method, attorneys' fees are calculated by "determining the number of hours productively spent on the litigation and multiplying those hours by reasonable hourly rates." *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 305 (1st Cir.1995). The resulting figure can then be enhanced through the application of a multiplier to account for the contingent nature of the action or other factors. *See, e.g., Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.,* 778 F.2d 890, 894 (1st Cir.1985). *See also* 4 NEWBERG ON CLASS ACTIONS § 13:80 (4th ed.2008).

Here, class counsel assert that approximately 7,400 hours were expended on this litigation by the three firms comprising Class Co–Lead Counsel and the twenty-two other firms involved, resulting in a lodestar of over $3,300,000.[4] Petition at 4–

---

**1.** In the related financial track litigation, banking associations representing banks who issued some of the affected cards asserted that this number drastically underestimates the scale of the intrusion and contended the hackers actually compromised the security of over 94,000,000 accounts. Banking Assoc. Pls.' Reply to Response to Mot. Certify Class [Doc. 171] at 1. The precise number of accounts compromised may never be known. *See* Pereira, *Breaking the Code,* at A1.

**2.** The approval was not absolute. The Court struck from the settlement the provision that TJX hold a one-day special event sale during

which all merchandise would be discounted. Fairness Hearing Tr. [Doc. 360] at 7–8.

**3.** Counsel also requested reimbursement for expenses and costs in the amount of $150,000. Petition for Award of Fees and Expenses ("Petition") [Doc. 353] at 1. The Court approved this portion of the request, subject to adequate documentation, at the fairness hearing. Fairness Hearing Tr. at 22.

**4.** The three Co–Lead Counsel firms billed 4,758.4 hours, resulting in a lodestar of approximately $2,100,000. Petition at 5 n. 3;

5 & n. 3. Class counsel suggest that this Court apply a multiplier of 1.97 in order to reach the requested amount. *Id.* at 5.

## II. OBLIGATION TO EVALUATE PETITION FOR REASONABLENESS

■ As part of the Agreement, TJX agreed to pay court-approved attorneys' fees not to exceed $6,500,000.[5] Settlement Agreement [Doc. 293 Ex. 1] ¶ 7.2. Accordingly, it does not contest class counsel's petition for fees. The acquiescence of the defendant, however, does not relieve this Court of its obligation to examine the fee request to ensure that the awarded fees are fair and reasonable. *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 520, 522 (1st Cir.1991). Judicial examination is necessary in this context to deter class counsel from accepting "less-than-optimal" settlement terms for the class "in exchange for red-carpet treatment on fees."[6] *Id.* at 524.

■ Nor is the Court's duty lessened by the fact that the amount awarded in fees and costs will not diminish the class recovery. Although TJX agreed to pay these expenses separate from and in addition to the money it has set aside to provide benefits to the class, Pls.' Suppl. Br. for Award of Fees [Doc. 366] at 8, the First Circuit has instructed that this type of scenario is one in which "heightened judicial oversight" is "highly desirable" because class members have little to no incentive to challenge the reasonableness of the requested fee. *Weinberger,* 925 F.2d at 525.

The Court is cognizant not only of its responsibility to the class but also to the public to ensure that the fees awarded here are reasonable. *See Duhaime v. John Hancock Mut. Life Ins. Co.,* 989 F.Supp. 375, 379 (D.Mass.1997) (O'Toole, J.) ("Because any [fee] award has the potential for 'precedential value' in future cases, the Court owes a duty to the principled development of the law to exercise careful judgment in reviewing agreed-upon fees."). Because "[o]ne of the most significant considerations taken into account in setting the ultimate fee is the benefit conferred by the litigation," 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1803.1 at 355 (3d ed.2005), the Court turns its attention to the benefits secured by the Agreement.

## III. BENEFITS TO CLASS

Class counsel, in support of their fee request, assert that the Agreement provides for over $200,000,000 in benefits to the class.[7] *See* Pls' Suppl. Br. for Award

*Id.* Ex. 1 (Wolf Popper billing sheet); *Id.* Ex. 6 (Berger & Montague billing sheet); *Id.* Ex. 10 (Barnow & Associates billing sheet).

5. It also agreed to reimburse class counsel for reasonable costs and expenses associated with the litigation, up to a cap of $150,000. Settlement Agreement ¶ 7.2.

6. This Court in no way suspects class counsel of any collusion or other untoward behavior in the negotiation of the Agreement. Indeed, the Court has praised counsel for its efforts on behalf of the class and the "excellent settlement" that resulted therefrom. *See, e.g.,* Fairness Hearing Tr. at 8, 9, 18. Nonetheless, scrutiny of all unopposed fee petitions—even those filed by counsel highly regarded by the Court—is necessary to further the deterrence objective.

7. The settlement class encompasses "all Persons in the United States (including the District of Columbia), Puerto Rico or Canada who shopped at TJX Stores in the United States, Puerto Rico or Canada, made a purchase or return, have had or allege having had personal or financial data stolen or placed at risk of being stolen from TJX's computer systems, and who were or may be damaged thereby or who allege damage therefrom." Settlement Agreement ¶ 1.19.

of Fees at 3. These benefits can be sorted into three groups by reference to those eligible to receive them.

The first category of benefits—which, incidentally, makes up the vast majority of the settlement's purported value—are available only to a subset of around 454,500 class members known as "unreceipted return customers." *See* Petition at 6. These customers returned merchandise to TJX without a receipt, provided personal information to TJX upon the return, and later received a letter from TJX explaining that their personal information may have been stolen during the data breach. Settlement Agreement ¶ 1.25. TJX agreed to provide these customers with a total of three years of credit monitoring,[8] including identity theft insurance. Settlement Agreement ¶ 2.1(a). Claiming it would cost each class member $390 to obtain this coverage for this length of time, Pls.' Mem. in Supp. Final App. at 3, and given the number of unreceipted return customers, class counsel values this benefit alone at over $177,000,000. Fairness Hearing Tr. at 5.

TJX also agreed to reimburse unreceipted return customers who could document that, as the result of the intrusion, they incurred costs to replace their driver's licenses. Settlement Agreement ¶ 2.1(b). Additionally, the Agreement provides for TJX to reimburse certain unreceipted return customers whose social security numbers were the same as their driver's license, military, tax, or state identification

numbers for losses over $60 (excluding credit or debit card charges) that occurred as a result of identity theft traceable to the breach.[9] Customers were required to submit both a written claim and proof of these losses,[10] *id.* ¶ 2.1(c)(i), and the aggregate amount payable by TJX was limited to $1,000,000, *id.* ¶ 2.1(c)(iii).

The second class of benefits could be claimed by class members—including unreceipted return customers—who certified that (1) they made a purchase with a credit card, debit card, or check at TJX stores during the relevant time periods and (2) that they incurred at least $5 in out-of-pocket expenses or lost time (valued at $10 an hour) as a result of the intrusion. *Id.* ¶ 2.2. These class members were given the option of receiving either a check or a voucher for use at TJX stores. The amount class members received in checks or vouchers was dependent on which of two options class members chose to demonstrate that they satisfied these prerequisites.

Under the "self-certification" option, class members needed only to state, under penalty of perjury, that they had made a check or card purchase and that they had suffered the required loss. *Id.* ¶ 2.2(a). These individuals would receive, at their option, either a $15 check or a $30 voucher. *Id.* The Agreement imposes a $10,000,000 cap on claims made by self-certifying class members, against which

---

**8.** Some of these customers accepted a previous offer by TJX to receive one year of credit monitoring. These individuals, under the settlement, would be eligible to receive an additional two years. *See* Settlement Agreement ¶ 2.1(a).

**9.** Unreceipted return customers who accepted TJX's previous offer of credit monitoring were ineligible for this benefit. Settlement Agreement ¶ 2.1(c).

**10.** The Agreement provides that TJX, after receiving these documents, may choose to accept, reject, or conduct further investigation with regard to any claim. Settlement Agreement ¶ 2.1(c)(I). Customers could submit any rejected claims to an independent arbitrator at TJX's expense. *Id.* ¶ 2.1(c)(ii).

each claim, whether for a check or voucher, is counted as a $30 charge. *Id.*

On the other hand, class members who could provide documents proving that they both made a qualifying purchase (for example, a credit card statement) and suffered the requisite loss were eligible to receive a $30 check or $60 in vouchers. *Id.* ¶ 2.2(b). The Agreement imposed no cap on the value of vouchers that class members could claim via this method but limited the payout made in check form to $7,000,000. *Id.*

The third category of what class counsel characterizes as benefits secured to the class consists of those generally available to all class members. For example, TJX agreed to provide an "ombudsman" at a toll-free number to answer consumer questions on topics relating to the breach. *Id.* ¶ 2.4. Class counsel also conditioned agreement to the settlement upon a finding by its independent expert that TJX made a "prudent and good faith" attempt to minimize the likelihood of future security breaches, *id.* ¶ 2.5, which, according to class counsel, benefitted the class by permitting them to shop at TJX stores in the future with peace of mind. Fairness Hearing Tr. at 20. Finally, TJX agreed to bear the costs of notice and claims administration. Settlement Agreement ¶ 2.6. The cost of the notice program was $4,000,000. Pls.' Suppl. Br. for Award of Fees at 8. While claims administration obviously is ongoing, class counsel projects its cost will reach $500,000. *Id.*

**11.** At most, eighteen objections were filed by class members. Pls.' Mem. in Supp. Final Approval [Doc. 365] at 13. *But see* Def.'s Mem. in Supp. Final Approval [Doc. 363] at 15 & n. 11 (arguing that only fourteen objections were submitted and that the other four letters fail to present objections). Only a subset of these objected to the attorneys' fees.

## IV. REASONABLENESS OF REQUEST

■ Determining whether a requested fee is reasonable requires consideration of a variety of factors. Some of the most typical include (1) the reaction of the class members to the settlement and proposed attorneys' fees; (2) the skill and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risk that the litigation will be unsuccessful; (5) the amount of time devoted to the case by counsel, and (6) the extent of the benefit obtained. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D.Mass.2005); *In re Lupron Mktg. and Sales Practices Litig.*, No. 01–CV–10861, 2005 WL 2006833, at *3 (D.Mass. Aug. 17, 2005) (Stearns, J.).

It is the final factor, the extent of the benefit, that here raises questions about the reasonableness of class counsel's fee petition. According to class counsel, the litigation produced over $200,000,000 in benefits for the class, such that their requested fee is a mere 3.25% of the settlement value. Petition at 7. At first glance, it may thus appear that the fee request is reasonable given, inter alia, the Court's stated satisfaction with the quality of class counsel, the thousands of hours expended on litigation, and the dearth of complaints from class members on the issue of fees.[11] As of October 30, 2008, however, class members had claimed just over $6,100,000 in benefits, a figure unlikely significantly to increase.[12] *See* Rev. Ex. A to Pls.'

**12.** The deadlines to submit claims for credit monitoring, for vouchers and checks, and for reimbursement of costs incurred to replace driver's licenses all have passed. Def.'s Mem. in Supp. Final Approval at 8, 9 n. 6.

Although unreceipted return customers are not required to submit claims for reimbursement of costs incurred due to identity theft until six months after the effective date of the settlement, *id.* at 8, the payout is not likely to

Supp. Br. for Award of Fees [Doc. 366]. To grant the petition would thus put more money in the pockets of the attorneys than in those of the wronged clients in whose name the suit was brought.[13] When viewed through this prism, the benefits obtained for the class seem "virtual rather than real," Fairness Hearing Tr. at 13, and the requested fee accordingly less reasonable.

What, then, is the proper basis for comparison? Class counsel urges this Court that it must consider "the entire basket of benefits ..., not whether class members chose to submit a claim." Pls.' Suppl. Br. for Award of Fees at 9. Indeed, two circuit courts of appeal—the Second and the Ninth—have held that a district court committed an abuse of discretion when it awarded fees by reference to the latter rather than the former criterion. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436–37 (2d Cir.2007) (noting that "[t]he entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class"); *Williams v. MGM–Pathe Commc'ns Co.*, 129 F.3d 1026, 1027

(9th Cir.1997) (reasoning consideration of entire fund was required because defendants "knew, because it was in the settlement agreement, that the class attorneys would seek to recover fees based on the entire $4.5 million fund"). Furthermore, while not requiring lower courts to use the entire common fund as the basis for making a fee award, the Supreme Court and the Eleventh Circuit Court of Appeals have both indicated support, at least in some circumstances, for this practice. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 479, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (permitting application of percentage-of-fund methodology to a "lump-sum judgment" to which "each member of a certified class has an undisputed and mathematically ascertainable claim"); *Waters v. International Precious Metals Corp.*, 190 F.3d 1291, 1295–97 (11th Cir.1999) (holding that award based on total common fund, rather than on value of claims made, was not an abuse of discretion where the "total fund amount ... was not illusory or meaningless").

There is a key distinction, however, between each of these decisions and the cir-

---

be substantial. As an initial matter, the Agreement caps payout of these claims at $1,000,000. Settlement Agreement ¶ 2.1(c)(iii). Furthermore, the status of these claims to date suggests that the amount actually collected by the class will be small. As of July, 2008, class members had submitted almost 4,800 claims under this category. Def.'s Mem. in Supp. Final Approval at 8. As of October 24, 2008, none of the claims had been deemed valid, and no payout had been made. *See* Rev. Ex. A to Pls.' Suppl. Br. for Award of Fees [Doc. 366].

**13.** Even accepting that the costs of notice and claim administration should be counted as value received by the class members, the total benefit would be only $10,600,000. *See* Pls.' Suppl. Br. for Award of Fees at 8. Class counsel's requested fee would still appear to be disproportionately high in comparison to this figure.

Class counsel, noting that TJX spent $10,000,000 to improve its computer security after the breach and that they conditioned the settlement on the finding by its expert that TJX made a good faith effort to prevent future intrusions, suggests the Court add an additional $3,000,000 to the total value of benefits received by consumers. *Id.* at 6. This the Court declines to do. Counsel has presented no evidence that TJX took any action that it would not otherwise have taken due to the fact that an expert was required to make a finding of good faith. Indeed, this Court, as a matter of common sense and the information it learned during the related financial track litigation, considers it obvious that TJX would have shored up its vulnerabilities in any event due both to the need mitigate the public relations fallout from the breach and the pressure brought to bear by Visa and MasterCard.

cumstances confronted by this Court. In all four cited cases, there was an actual common fund—whether created by settlement or judgment of the court—to which the percentage-of-fund method of determining attorneys' fees was applied. In contrast, the Agreement here creates no fund; it simply provides that TJX will pay claims on an as-made basis, subject to certain caps. In the same vein, although they justify their fee request in terms of percentages, class counsel have fashioned their request via the lodestar/multiplier approach. This difference blunts the impact of the cases upon which they rely. *See Weinberger*, 925 F.2d at 526 n. 10 (noting that the absence of a "true common fund renders the percentage approach inopposite"). Indeed, the Supreme Court in *Boeing* expressly refrained from ruling on the question of whether its decision was applicable to circumstances in which a class action judgment did not create a common fund but rather required a defendant "to give security against all potential claims." 444 U.S. at 480 n. 5, 100 S.Ct. 745.

Furthermore, there is support for the proposition that the reasonableness of a fee award properly may be judged in comparison to the benefits actually claimed by the class. *See* 7B WRIGHT, MILLER, AND KANE, *supra*, § 1803.1 at 380 (noting split of authority). Justice Sandra Day O'Connor, writing to deny certiorari in *Waters*, noted "several troubling consequences" of an approach that failed to require "some rational connection between the fee award and the amount of the actual distribution to the class" and spoke in favor of granting review of the question "in an appropriate case." *International Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1223, 120 S.Ct. 2237, 147 L.Ed.2d 265 (2000) (O'Connor, J., writing on denial of certiorari). In addition, the Fifth Circuit has upheld a district court's choice to grant fees by

reference to the claims made by the class. *See Strong v. BellSouth Telecomms.*, 137 F.3d 844, 852–53 (5th Cir.1998). Significantly, the circumstances in *Strong* are not so different than those here. There was no common fund created, and the district court indicated that it was concerned that the valuation of benefits created by litigation given by class counsel was "illusory." *Id.* at 853. *See* Fairness Hearing Tr. at 13 (expressing concern that disparity between valuation given by class counsel and value of claims actually made by class demonstrates the benefits referenced by class counsel are "virtual rather than real").

Similarly, in *Duhaime v. John Hancock Mutual Life Insurance Company*, 989 F.Supp. 375, 379 (D.Mass.1997), Judge O'Toole in this District stated that "the proportionality of the fee to the relief actually accruing to the class is an ... important consideration in assessing the reasonableness of the fee award." Thus, the court chose to withhold a portion of the requested fee until after class members submitted their claims, permitting the court to determine whether the actual value created by the litigation approached that estimated by class counsel. *Id.* at 379–80. The court considered this the best way to ensure "the fee awarded [was] appropriate to the value actually received by the class members." *Id.* at 378.

In a final example, the Northern District of California adjudged a fee award to class counsel by reference to the claims made by the class—notwithstanding *Williams*, 129 F.3d 1026—where the "defendant did not agree to pay a certain dollar amount to the class" but instead agreed only to pay for those claims made in a timely fashion. *Yeagley v. Wells Fargo & Co.*, No. 05–03403, 2008 WL 171083, at *6 (N.D.Cal. Jan.18, 2008) (Breyer, J.). In rejecting class counsel's argument that it must weigh the fee petition with reference to

what the defendant *could* have paid under the settlement, the court asserted that this would require "adopt[ing] [a] fiction." *Id.* at *7. This was especially true given that the settlement agreement simply provided that the defendant agreed to pay fees "*not to exceed* $1.5 million ... thus expressly [leaving] open the possibility that the Court would award less than $1.5 million and [leaving] unanswered the amount of the 'common fund' for the purpose of computing a reasonable attorney's fee."[14] *Id.* at *8 (emphasis in original).

At the core of the *Yeagley* decision was the court's concern that the valuation of the settlement proffered by class counsel was "pure fantasy" because there was no evidence that "suggest[ed] that the parties reasonably believed that [the defendant] would actually pay anything near that amount." *Id.* Furthermore, the court indicated a desire to encourage class counsel, by tying fees to claims actually made, to design settlements that offer benefits that actively appeal to the consumers they represent, to come up with more effective notice programs, and to adopt mechanisms that lend themselves toward getting benefits to the consumer. It reasoned:

> To award class counsel the same fee regardless of the claim participation rate, that is, regardless of the enthusiasm of the class for the benefits purportedly negotiated on their behalf, would reduce the incentive in future cases for class counsel to create a settlement which actually addresses the needs of the class.... If the Court takes [the ineffectiveness in fashioning relief] into account in setting the fee, in future litigation class case counsel will design a settlement that actually reaches consumers, perhaps through a different mode of

communication. If the Court ignores the settlement's effectiveness, as class counsel urges, there is little incentive to design an effective settlement since they will receive the same fee regardless. Common sense dictates that a reasonable fee in a class action settlement is a fee that takes into account the actual results obtained.

*Id.* at *9.

The *Yeagley* court thus touches on the issues that drive the Court's hesitancy here. Simply awarding fees by reference to the valuation of the settlement presented by counsel requires a court to ignore two interrelated realities about class action litigation. First, only a fraction of any given class is likely to claim the benefits provided for in a settlement. Indeed, "[i]t is not unusual for only 10 or 15% of the class members to bother filing claims," and "[w]hen settlements require class members to file statements or proofs of claim in order to receive their share ... 'response rates are often very small, and rarely exceed 50%.' " Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 119–20 (2007) (quoting *Petruzzi's Inc. v. Darling–Delaware Co.*, 983 F.Supp. 595, 605 (M.D.Pa.1996)). *See also Sylvester v. CIGNA Corp.*, 369 F.Supp.2d 34, 52 (D.Me.2005) (" '[C]laims made' settlements regularly yield response rates of 10 percent or less."). In any given case, class member nonparticipation may be attributed to a variety of factors: an ineffective notice program that fails to make class members aware of their rights, unappealing benefits that do not provide sufficient incentive for class members to invest the effort to submit a claim, or a claims process that is confusing, time-con-

---

**14.** It was on this basis that *Yeagley* distinguished *Williams*, in which the settlement agreement contemplated that $4,500,000 be the fund used to evaluate the award of attorneys' fees. *See Yeagley*, 2008 WL 171083, at *8; *see also Williams*, 129 F.3d at 1027.

suming, or requires class members to submit documentation or information they are unlikely to have in order to obtain relief.[15] The fact remains, however, that in a reversionary common fund or a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees.

Second, attorneys for each side bargain knowing that this is true. Thus, class counsel can—and likely often do—push defendants for higher payout caps or fund amounts in order to expand the basis for their fee petition without any real expectation that those additional funds will be claimed by the class. *See In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 736 (1st Cir.1999) ("In certain types of complex litigation, the lawyers' monetary interests often comprise a tail that wags the dog."); *Waters*, 190 F.3d at 1297 (noting that the values attached to "many" class action settlement funds are "illusory" or "meaningless"); Leslie, *The Significance of Silence, supra*, at 83 ("To convince judges to award significant attorneys' fees, the lawyers who negotiated the settlement may attempt to make [it] seem more significant than it is."). *See also* William B. Rubenstein, *The Expert's Corner: Percentage of What?*, 1 CLASS ACTION ATT'Y FEE DIG. 63, 64 (March 2007) ("The weakness in this approach [of awarding fees based on benefits made available] is it arguably sets up a conflict between counsel and the class by creating an incentive for counsel to accept a settlement unlikely to yield a high claiming rate—e.g., a coupon—in exchange for being guaranteed a percentage of the fund made available, not claimed."). At the same time, defendants can agree to these demands—permitting them more expeditiously to settle the case and minimize their overall costs—at little risk to themselves. *See Sylvester*, 369 F.Supp.2d at 52 (noting that the "parties' expectations of a low response rate [with regard to a class action settlement] gives the reverter clause real value for Defendants").[16]

---

**15.** For example, Bed Bath & Beyond recently settled a class action lawsuit alleging it misrepresented the thread count of certain bed sheets. The class encompassed any consumer who purchased certain products from 2000 to 2007. Bed Bath & Beyond Thread Count Class and Settlement Notice at 1, *available at* http://bbbthreadcountsettlement.com/pdfs/BBT—NOT—071126.pdf. In order to obtain the most attractive relief—a refund of the purchase price if the consumer no longer wished to keep their sheets or a $10 gift card to Bed Bath & Beyond if they did—the consumer had to produce a receipt, email shipping confirmation, packing invoice, or credit card or bank statement demonstrating they purchased the offending product. *Id.* Common sense indicates that, given that bed sheets constitute a relatively small-scale purchase, an average consumer is unlikely to keep this documentation for years.

Those consumers who could not produce a document were not altogether excluded from the settlement. They were eligible to receive a 20% off coupon for a purchase at Bed Bath & Beyond if they stated under oath that they made a qualifying purchase during the relevant time period. *Id.* These class members, however, were also required to give specific information about their purchase, including the date, the price, and the location of the store. *Id.* The notion that consumers would still retain these details of a relatively trivial purchase years after the occurrence borders on the ludicrous.

**16.** The likelihood of such pseudo-negotiations increases in inverse proportion to the likelihood of an actual trial upon genuine evidence. As this Court has remarked in the related area of multi-district litigation, an over-emphasis on settlement rather than trial preparation tends unfairly to skew the bargaining process. *See DeLaventura v. Columbia Acorn Trust*, 417 F.Supp.2d 147, 153–55 (D.Mass.2006). Or as Professor Samuel Issacharoff, Visiting Professor of Law at Harvard Law School, tells his students with succinct brilliance, "Multi-district litigation is like the old Roach Motel ad: 'Roaches [the transferred cases] check in—but they don't check out.' "

Similarly, unscrupulous class counsel may agree to conditions on a settlement—such as a short timeframe in which to make claims or a burdensome claims procedure—in order to obtain additional concessions from the defendant that purportedly increase the value created by the litigation and that support an enhanced fee award. The defendant, meanwhile, may grant these concessions precisely because the conditions attached to them would make it unlikely that a significant number of class members would cash in.

At bottom, class action litigation should benefit the individuals who have been harmed. To be sure, class action lawsuits have a valuable deterrent role to play, and there is therapeutic and punitive value in requiring defendants to pay for wrongful conduct, regardless of to whom those monies are transferred. But these considerations ought not cause courts complacently to abide an institution that fails efficiently and effectively to deliver relief into the hands of those in whose name it was established—the class.

At its core, the problem appears to be just that—institutional. As discussed above, class counsel can and surely do contribute to the problem in some cases by placing their interests before those of the class or by failing to give adequate thought to matters such as how the class members may best be reached or what benefits may most be appreciated. The circumstances of this case, however, demonstrate that even when class counsel perform ably, with integrity, and with an eye toward ensuring that class members are aware of a settlement that offers them an opportunity to claim benefits of value with a minimum of fuss, there still may be underwhelming class participation. For example, just 14,496 of the approximately 454,500 unreceipted return customers—slightly more than three percent—claimed the credit

monitoring benefit. *See* Rev. Ex. A. to Pls.' Supp. Br. for Award of Fees.

Simply put, the class action vehicle is broken. While it may not instantaneously or completely resolve the problems that currently inhere in this type of litigation, tying the award of attorneys' fees to claims made by class members is one step that judges can take toward repair. This approach will not only encourage more realistic settlement negotiations and agreements, but also will drive class counsel to devise ways to improve how class action suits and settlements operate. *See* Deborah R. Hensler and Thomas D. Rowe, Jr., *Beyond "It Just Ain't Worth It": Alternative Strategies for Damage Class Action Reform,* 64 LAW & CONTEMP. PROBS. 137, 150 (2001) (" 'The single most important action that judges can take to support the public goals of class action litigation is to reward class action attorneys only for lawsuits that actually accomplish something of value to class members and society.' To this end, ... analysts recommend[ ] that judges award fees based on the actual amounts paid out by defendants to class members, notwithstanding contrary case law." (quoting DEBORAH HENSLER ET AL., RAND, CLASS ACTION DILEMMAS: PURSUING PUBLIC GOALS FOR PRIVATE GAIN—EXECUTIVE SUMMARY 33 (1999))). Class counsel will have an incentive to pay attention to the needs and desires of the class and to "think outside the box" to devise better notice programs, settlement terms, and claim procedures, all to the benefit of the consumers who have been harmed.

Linking attorneys' fees to claims serves two additional objectives. First, it prevents "windfalls" for attorneys created by "class apathy." *In re Arakis Energy Corp. Sec. Litig.,* No. 95 CV 3431, 2001 WL 1590512, at *14 (E.D.N.Y. Oct.31, 2001). Although commentators dispute whether windfalls for class counsel are a

widespread problem, *see* 7B WRIGHT, MILLER, AND KANE, *supra*, § 1803.1 at 339–40 (asserting there is a "virtual absence of empirical data showing any significant incidence of excessive fees"), making attorneys' fees conditional on class participation would eliminate even isolated incidents of excessive fees and help preserve the legitimacy with which the public views the class action vehicle and the judicial system in general. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 469 (2d Cir.1974), *abrogated by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir.2000) ("For the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the court should avoid awarding windfall fees and that they should likewise avoid every appearance of having done so.") (internal quotation marks omitted).

Second, there are surely plaintiffs' lawyers who bring putative class action lawsuits without merit, assuming, correctly, that in many cases the defendant will settle the case to avoid a small probability of a substantial judgment. *See* Louis W. Hensler III, *Class Counsel, Self-Interest and Other People's Money*, 35 U. MEM. L.REV. 53, 65–68 (2004) ("Courts have expressly recognized that certification can encourage meritless claims by transforming any claim into a megasuit, thereby creating instant settlement leverage with little or no relation to the relative merits of the claim."). *See also* Lance P. McMillian, *The Nuisance Settlement "Problem": The Elusive Truth and a Clarifying Proposal*, 31 AM. J. TRIAL ADVOC. 221, 252 & n. 94 (2007). As Justice O'Connor rightfully noted, the failure to link fees to benefits claimed thus "could encourage the filing of needless lawsuits." *International Precious Metals Corp.*, 530 U.S. at 1223, 120 S.Ct. 2237. Accordingly, the approach advocated here would be a positive step toward the preservation of judicial resources.

Of course, there are those who assert that if the courts of the United States were to adopt this Court's position, plaintiffs' lawyers would have no incentive to bring putative class actions at all, regardless of their merit, because they would have no expectation of adequate compensation for their efforts; thus, broad swaths of wrongful conduct would go unpunished and undeterred. *See* Hailyn Chen, *Attorneys' Fees and Reversionary Fund Settlements in Small Claims Consumer Class Actions*, 50 U.C.L.A. L. REV. 879, 892 (2003) ("Limiting class counsel to a fee based on a percentage of what class members actually claim will, in many instances, result in a fee that is so small as to prevent class action attorneys from pursuing such cases...."); 7B WRIGHT, MILLER, AND KANE, *supra*, § 1803.1 at 369 ("If counsel did not have the prospect of an award that took account of the risks and uncertainties, the necessary incentive would be lacking and a major weapon for enforcing various public policies would be blunted."). In this case, class counsel argued that making "receipt of a fee contingent upon class members submitting a claim form ... would discourage, if not eliminate, capable and experienced counsel from risking years of litigation against well-financed companies." Pls.' Supp. Br. for Award of Fees at 17. The Court is not overly concerned with such doomsday predictions. As an initial matter, this argument rests on the premise—which this Court does not accept—that claim rates will always remain low. To the contrary, the Court believes that with creativity and thoughtfulness, class counsel will be able to design effective settlements that offer appealing benefits to class members, who will respond positively to the effort.

Furthermore, this Court has no doubt that class action lawyers, who have demonstrated their resilience in the face of previous developments in class action law, will adjust their methods and mindset to cope with the new fee regime. *See* Howard M. Erichson, *CAFA's Impact on Class Action Lawyers,* 156 U. Pa. L.Rev. 1593, 1606 (2008) ("Understanding the [Class Action Fairness Act of 2005's] impact requires an appreciation of the resilience of mass litigators."). With regard to methods, class counsel may learn to work more efficiently, such that the awarded fee provides them with satisfactory compensation vis a vis the amount of time spent on the litigation. With regard to mindset, some resistance to and grumbling about a cut in pay is to be expected. It is not, however, as if class counsel currently bill time at bargain-basement rates. Even a modest reduction in fee awards would still offer class counsel an objectively lucrative field of practice. The Court does not believe that the plaintiffs' bar as a whole will throw up their hands and abandon class action litigation so long as there is still money to be made, even if that amount is not quite as much as it was in the past.

It is much like diners complaining that their dinner has been reduced from six courses to four. The diners' disappointment about this development is understandable; the food is good, and the diners are accustomed to the additional courses. Nonetheless, the scaled-back meal still provides an abundance of food. Most diners will realize this and be content, and even if some diners leave in a show of protest, there are other hungry people who will be more than willing to pull a chair up to the table.

## V. THE FEE AWARD

■ Notwithstanding the foregoing discussion, the Court concludes that an award of attorneys' fees in the amount of $6,500,000 is reasonable in this case. As an initial matter, class counsel put forth a lodestar of $3,300,000, which is a presumptively reasonable fee. *Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992). In addition, the suggested multiplier of 1.97 is within the range that has been recognized as reasonable. *See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F.Supp.2d 249, 271 (D.N.H.2007) (applying lodestar multiplier of 2.697); *In re Relafen,* 231 F.R.D. at 82 ("A multiplier of 2.02 is appropriate.").

Furthermore, the majority of factors generally considered when evaluating a fee award weigh in class counsel's favor in this case. For example, Class Co–Lead Counsel is comprised of qualified attorneys from firms experienced in this type of litigation, *see* Ex. 3 to Levy Aff. [Doc. 353 Ex. 4]; Ex. 3 to Savett Aff. [Doc. 353 Ex. 8], and counsel demonstrated more than satisfactory skill and effort in the course of their advocacy. In addition, class counsel spent a significant amount of time on this case—almost 8,000 hours. And, as noted above, only a handful of class members expressed opposition to the attorneys' fees provision of the Agreement.

Indeed, the only factor that caused the Court to pause was the relation of the fee award to the benefit conferred on the class by the litigation. Although class counsel assert that the litigation created over $200,000,000 in benefits, the Court is disinclined to credit this figure because this amount was reached by reference to the payout caps provided for in the Agreement. For example, the Agreement provides for $10,000,000 in vouchers or checks to self-certifying customers, *see* Agreement ¶ 2.2(a), $7,000,000 in checks to customers who submit documentation of their losses, *id.* ¶ 2.2(b), and $1,000,000 in reimbursement to unreceipted return custom-

ers who sustained losses of $60 or more due to identity theft, *id.* ¶ 2.1(c)(iii). These numbers are illusory. A benefit on paper is meaningless if class members do not satisfy the prerequisites to claim it.

Consider, for example, the $1,000,000 set aside for reimbursement to unreceipted return customers for identity theft losses. The parties present no basis, such as evidence of how many class members experienced such losses or in what total amount, upon which they concluded this benefit could, in theory, be transferred up to the payout cap to class members. Moreover, not one of the almost 5,000 people who has attempted to recoup losses under this provision has been successful. Similarly, although common sense would have dictated that *some* class members experienced the requisite losses to claim the checks or vouchers—and indeed, that some would have documentation to prove it—that does not mean that the parties believed that so many class members fulfilled the requirements that the $10,000,000 and $7,000,000 caps would be reached.[17]

The Court, however, is satisfied that the Agreement creates a concrete benefit insofar as it provides that unreceipted return customers could receive credit monitoring services. The parties identified ex ante specifically how many class members were eligible to receive this benefit; indeed, the definition of "unreceipted return customer" encompassed only those customers contacted by TJX and told that their information may have been stolen. The parties also determined with certainty the value, in the form of the cost of the credit monitoring subscription, that would be transferred to each unreceipted return customer who made a claim. Therefore, unlike the figures attached to other benefits—for which it was unclear how many class members, if any, might qualify and what amount they might claim[18]—the $177,000,000 attributed to this benefit has meaning. Accordingly, the Court is comfortable characterizing this litigation as creating $177,000,000 in potential benefits for the class and using this figure as a benchmark against which to measure the award of attorneys' fees.

Although the Court remains concerned about the fee award with relation to the amount of value actually transferred to class members, it did not give class counsel any indication prior to the Fairness Hearing that its award of attorneys' fees might be made with reference to this criterion. It would thus be unfair to act—in this case—on its institutional concerns to class counsel's detriment.

## VI. CONCLUSION

A common theme recited by class action lawyers when confronted with concerns about fee awards disproportionate to benefits actually disbursed to class members is, "You can lead a horse to water, but you can't make him drink." *Sylvester,* 369

---

17. Simply referencing the number of accounts compromised in the breach is insufficient for this purpose. The submissions in the financial track litigation established that a significant number of the accounts had expired or been cancelled at the time of the breach, such that consumers could have suffered no losses.

18. With regard to identity theft losses on the part of unreceipted return customers, these theoretically could range from de minimis to hundreds or even thousands of dollars. For the class members who suffered $5 in losses as a result of the breach—the number of which appears not to have been known by the parties to any degree of certainty—and were thus eligible to claim vouchers or checks, there was no way to know how many might be self-certifying (and thus eligible for $15 checks or $30 vouchers) or how many might have documentation (and eligible for double these amounts).

F.Supp.2d at 49. In this case, for example, class counsel argued that the Court's proposed linkage of fees to benefits claimed was not "fair" because counsel "made much, much more available to people than they chose to accept," Fairness Hearing Tr. at 6, and because the low claim rate was not class counsel's "fault," *id.* at 12. This may be true, but it stands to reason that one can maximize the chances that a horse will drink by, for example, verifying the horse can see the water, choosing clear, fresh, and cold water so that the horse is given the utmost incentive to drink, and making sure there are no obstacles in the horse's path. This Court plans to ensure that class counsel does everything in their power "to ensure that the settlement provides real value (or, to extend the metaphor of the just quoted aphorism, 'actual drinks')" to the class. *Sylvester,* 369 F.Supp.2d at 49.

The petition for an award of attorneys' fees in the amount of $6,500,000 [Doc. 353] is GRANTED. In the future, however, plaintiffs' counsel can expect that this Court, when confronted with reversionary common fund or claims-made settlements, will award attorneys' fees *by reference to the value of benefits actually put in the hands of the class members.* This strikes the Court as the best way to encourage settlements that actually serve the needs and desires of the class as well as a solid first step toward bettering the effectiveness and efficiency of the class action vehicle as a whole by providing an incentive to its key players to begin looking for solutions to its problems.

SO ORDERED.